UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DCJM, LP,                                        )
                                                 )
                Plaintiff,                       )
                                                 )          No. 3:24-CV-354-TAV-JEM
v.                                               )
                                                 )
AUNT BUG'S CABIN RENTALS, LLC, *et al.*,         )
                                                 )
                Defendants.                      )

**REPORT AND RECOMMENDATION**

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the Order [Doc. 10] referring the matter by United States District Judge Thomas A. Varlan.

Now before the Court is Plaintiff's Motion for Declaratory Judgment and Preliminary Injunction and/or Temporary Restraining Order [Doc. 7]. Defendants responded in opposition to the motion [Doc. 19], and Plaintiff replied [Doc. 22]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a).

On September 24, 2024, the parties appeared before the undersigned for a motion hearing.[1] Attorney Matthew Anderson appeared on behalf of Plaintiff. Attorney Michael King appeared on behalf of Defendants. For the reasons explained below, the undersigned **RECOMMENDS** that the District Judge **DENY** Plaintiff's motion [**Doc. 7**].

---

[1]     The parties addressed a similar motion filed in *DJ Smoky, LLC v. Aunt Bug's Cabin Rentals, LLC*, No. 3:24-cv-364. While related cases, the cases are not consolidated [*See* 3:24-cv-364, Doc. 7].

# I.    BACKGROUND

"[Plaintiff] is a real estate investment company that buys and holds real estate for certain income purposes, including, but not limited to, short term and long-term rentals" [Doc. 1 ¶ 9]. It owns investment properties, five of which are related to this litigation (collectively, the "Properties"):

1.    828 Pinnacle Vista Road, Gatlinburg, TN ("Pinnacle Vista")

2.    2111 New Era, Sevierville, TN ("New Era")

3.    3714 Cinnamon Way, Sevierville, TN 37876 ("Cinnamon Way")

4.    3103 Laurelwood Lane, Sevierville, TN 37862 ("Laurelwood")

5.    3584 Mountain Creek Way, Cosby, TN 37722 ("Mountain Creek")

[*Id*. ¶ 10].

Defendant Aunt Bug's Cabin Rentals, LLC ("AB") "is a Tennessee licensed vacation lodging service firm[ that] provides services for the management and rental of luxury cabins in Eastern Tennessee on behalf of property owners, earning a commission for its services" [*Id*. ¶ 11]. Defendants Brian Spiezio and Shawn Spiezio are Tennessee licensed affiliate brokers for Mighty Peaks Realty, LLC ("Mighty Peaks") [*Id*. ¶¶ 12–13]. Defendant Brian Spiezio is the designated agent for Defendant AB, and Defendant Shawn Spiezio is the principal real estate broker for Defendant Mighty Peaks [*Id*.].

According to the allegations in the Complaint, "[b]etween 2018 and 2022, [Plaintiff] and [Defendant] AB entered into several contracts for the management of the Properties ("Management Agreements")" [*Id*. ¶ 14; *see also* Doc. 1-2]. They contained several provisions:

a.    A minimum term ("Minimum Term") between 12 to 36 months, depending on the Property;

2

b.     "Promotion" section where the Owner selects a promotion package that would extend the Minimum Term in exchange for waiving certain fees;

c.     A clause that states any breach or early termination before the Minimum Term will void all Owner promotions and require the Owner to reimburse AB for the value of those promotions. The Management Agreements do not specify any dollar amount or formula for calculating those values. Some Management Agreements also require the Owner to reimburse AB for "lost revenues based on historical data;"

d.     A breach of contract or early termination that cannot be resolved between the parties will result in mediation; and

e.     Prevailing party attorney fees and damages provision.

[*Id*. ¶ 15]. "Some of the Management Agreements stated that Plaintiff 'may use Company's in-house licensed real estate company for listing services, as necessary'" [*Id*. ¶ 16]. "[A]ll of the Management Agreements contain the provision stating that '[o]n-site real estate company will list property for Sale, if & when Owner desires Sale during term of the rental contract at market-best commission rates'" [*Id*. ¶ 17]. According to Plaintiff, "The Management Agreements do not contain the rental rates, termination date of the contracts, or markup or profit for expenses/maintenance as required by the Tennessee Real Estate Commission rules regarding Vacation Lodging Services providers" [*Id*. ¶ 19].

The Complaint alleges that "[i]n late 2022, [Plaintiff] decided to list the Laurelwood property for sale" [*Id*. ¶ 20]. The Laurelwood Management Agreement contained both provisions that Plaintiff "may use Company's in-house licensed real estate company" and that the "[o]n-site estate company will list property for Sale" [*Id*. ¶¶ 21–22]. It also stated, "Owner to require new Buyer [to] honor management contract the remaining term of rental agreement, if property sold on the real estate market" [*Id*. ¶ 23]. "On September 30, 2022, [Plaintiff] and [Defendant] Brian

Spiezio entered into an Exclusive Listing Agreement ("ELA"), establishing [him] as the exclusive real estate agent for [Plaintiff]" [*Id*. ¶ 25].

Plaintiff alleges that "[Defendant] Brian Spiezio received an offer of approximately $450,000 from a buyer for the potential purchase of the Laurelwood [p]roperty[,]" but he did not disclose this offer [*Id*. ¶¶ 26–27]. Instead, the potential buyer informed Plaintiff directly about the offer, which Plaintiff would have taken, but there was not sufficient time to accept the offer prior to it expiring [*Id*. ¶¶ 28, 30, 32]. Defendant Brian Spiezio told Plaintiff that he did not inform it of the offer "because the potential buyer was not interested in using [Defendant] AB as [the] property manager" [*Id*. ¶ 31]. Plaintiff alleges that Defendant Spiezio did not market, accept, or share offers on the Laurelwood property "from potential buyers who did not intend to use [Defendant] AB as their property management company" [*Id*. ¶ 33]. "The ELA expired on October 1, 2023. The parties did not execute any carry over clause, or otherwise agree to an extension of the ELA" [*Id*. ¶ 34].

Pursuant to the Management Agreements, Plaintiff paid Defendant AB a property management fee ("Property Management Fee") to manage its properties [*Id*. ¶ 36]. The Property Management Fee "cover[s] general maintenance and property management services" [*Id*. ¶ 37]. Defendant AB has billed Plaintiff "for a significant amount of additional maintenance fees . . . that should have been covered under the Property Management Fee" [*Id*. ¶ 38]. Plaintiff alleges that it "has routinely requested receipts and/or explanations for the maintenance charges[,]" but "[Defendant] AB has not provided detailed receipts or explanations for these charges, offering only generic statements suggesting the work is performed by in-house maintenance team" [*Id*. ¶ 40]. According to Plaintiff, "There were no additional written agreements between the parties specifying and agreeing to any extra maintenance charges beyond those included in the Property

Management Fee" [*Id*. ¶ 42]. Despite no additional agreements, Plaintiff alleges that Defendant AB billed it for "assisting guests with hot water issues, checking for propane, fixing TV issues, delivering the ice trays, inspecting leaks, and addressing WIFI and hot tub issues" [*Id*. ¶ 43].

Further, Plaintiff states that it and Defendant AB "agreed that [it] would supervise the construction/renovation of [Plaintiff's New Era and Pinnacle Vista Properties]" [*Id*. ¶¶ 44–45]. The estimated cost for the project was to exceed $25,000 [*Id*. ¶ 46]. "Instead of hiring a licensed general contractor, [Defendant] AB assumed the role of a general contractor, and oversaw the construction work for the project, and accepted fees from [Defendant] AB in connection with its assumed role as general contractor" [*Id*. ¶ 47]. It did not, however, have a general contractor's license as required pursuant to state law and it did not inform Plaintiff that it did not have a license [*Id*. ¶¶ 48–50]. Plaintiff alleges that Defendant AB took fees out of its trust account for its alleged earnings for construction without Plaintiff's knowledge or consent, charged it a 10% fee that the parties did not agree to, and when Plaintiff requested documented expenses, Defendant AB refused to provide them [*Id*. ¶¶ 51–56]. There were also issues with subcontractors' invoices, and Plaintiff had to oversee work on the sewer line that Defendant AB was supposed to oversee [*Id*. ¶¶ 58–74].

According to Plaintiff, "[a]round March 2024, [it] listed the Laurelwood and New Era Properties for sale with a brokerage [firm] that was not Mighty Peaks" [*Id*. ¶ 75]. On April 10, 2024, [Plaintiff] received a demand from [Defendant] AB's attorney stating that the listing of the properties [was] an early termination or breach that the parties were unable to resolve[] and that Section 24 of the Management Agreements required mediation" [*Id*. ¶ 76]. Defendant AB also "noted that the Management Agreement for the New Era Property required [Plaintiff] to use Mighty Peaks as the broker for the sale of the New Area Property" [*Id*. ¶ 78]. Plaintiff agreed to mediate, but mediation was unsuccessful [*Id*. ¶¶ 79–80].

"On July 17, 2024, [Plaintiff] sent a notice of termination ("Notice of Termination") to [Defendant] AB, formally ending the Management Agreements for the Cinnamon Way of Pinnacle Vista properties effective September 30, 2024[,] upon the expiration of the term" [*Id*. ¶ 81]. Shortly thereafter, Plaintiff sold the Laurelwood property, and it did not use Defendants Brian Spiezio, Shawn Spiezio, or Mighty Peaks as the real estate broker [*Id*. ¶¶ 82–83]. "The ELA was not in effect at that time of the sale of the Property. The new buyer did not use, or agree to use [Defendant] AB as its property management company" [*Id*. ¶¶ 84–85].

According to Plaintiff, "[i]n August 2024, [it] received owner statements ("Owners Statements") for five separate properties from [Defendant] AB providing a financial summary of the income, expenses, and disbursements for the management of the properties" [*Id*. ¶ 86]. Plaintiff states Defendant AB charged and debited $41,402 for "breached contract damages" [*Id*. ¶ 87]. "[Defendant] AB unilaterally accessed the trust account for [Plaintiff] and withdrew the sum of $20,333.63, allegedly to cover these supposed breach of contract damages" [*Id*. ¶ 88]. Plaintiff states, "[T]he alleged 'breach' is related to the sale of the Laurelwood property[] and the listing of the New Era Property" [*Id*. ¶ 89]. Plaintiff avers that "this alleged breach is also related to the appropriate termination of the Management Agreements for the Cinnamon Way and Pinnacle Vista properties pursuant to the Notice of Termination" [*Id*. ¶ 90]. The funds from the trust account, however, were from unrelated properties not part of this controversy [*Id*. ¶ 93]. According to Plaintiff, "[Defendant] AB has further indicated that it will continue to withdraw funds from [its] trust accounts to cover what it believes are going breach of contract damages" [*Id*. ¶ 94].

Plaintiff pleads ten counts in the Complaint: (1) declaratory and preliminary injunctive relief [*id*. ¶¶ 96–105]; (2) breach of the Management Agreements by Defendant AB [*id*. ¶¶ 106–112]; (3) conversion of property by Defendant AB [*id*. ¶¶ 113–19]; (4) professional negligence by

6

all Defendants [*id*. ¶¶ 120–26]; (5) negligent misrepresentation by Defendants AB, Shawn Spiezio, and Brian Spiezio [*id*. ¶¶ 127–34]; (6) violation of the Tennessee Real Estate Commission Rules and Guidelines by Defendants Brian Spiezio, Shawn Spiezio, and Mighty Peaks [*id*. ¶¶ 135–41]; (7) violation of the Tennessee Real Estate Broker Act against all Defendants [*id*. ¶¶ 142–46]; (8) violation of the Tennessee Consumer Protection Act against Defendant AB [*id*. ¶¶ 147–55]; (9) violation of the Tennessee Consumer Protection Act against all Defendants [*id*. ¶¶ 156–62]; and (10) violation of the Tennessee Real Estate Broker against all Defendants [*id*. ¶¶ 163–75].

A few days after filing the Complaint, on September 4, 2024, Plaintiff filed the Motion for Declaratory Judgment and Preliminary Injunction and/or Temporary Restraining Order [Doc. 7]. Plaintiff argues that a "[d]eclaratory judgment will settle the breach of contract controversy between the parties[] and serve a useful purpose in clarifying the legal relations between [them]" [*Id*. at 1]. In addition, Plaintiff submits that injunctive relief is warranted because it is likely to succeed on the merits of its case, it will sustain irreparable harm without an injunction, others will not be substantially harmed by an injunction, and the public interest favors granting an injunction [Doc. 13 pp. 12–21]. In support of its motion, Plaintiff filed the Affidavit of Matthew Anderson [Doc. 7 pp. 5–7], its attorney, and a copy of the ELA [Doc. 7-1 pp. 25–32].

Defendants oppose the requested relief [Doc. 19]. Defendants assert that Plaintiff's request for a declaratory judgment is premature [*Id*. at 17–20]. They also argue that Plaintiff has not met its burden in showing an injunction is warranted, noting among other things, that Plaintiff did not present any proof, including a verified complaint [*Id*. at 5–11].

Plaintiff replies that declaratory and injunctive relief are warranted "to prevent further injuries and protect its rights as a property owner moving forward" [Doc. 22 pp. 2– 3]. According

to Plaintiff, it needs an order from the Court for a peaceful transition of the properties [*Id.* at 4]. It denies that a verified complaint is necessary for its requested relief [*Id.* at 5–6].

## II. DECLARATORY JUDGMENT

Plaintiff seeks a declaratory judgment from the Court declaring that:

1. The ELA is not in effect, and expired in October 2023;

2. The provisions in the Management Agreements requiring Plaintiff to use Mighty Peaks as its real estate agent for the sale of the properties are invalid and unenforceable;

3. The provisions in the Management Agreements requiring Plaintiff to require a future buyer to use AB as the property management company are unenforceable under the Real Property Records Integrity Act pursuant to Tenn. Code Ann. § 66-33-101;

4. The Spiezios and/or Mighty Peaks are not entitled to a commission for the sale of the Laurelwood Property, the potential sale of the New Era Property, or the potential sale of any other property;

5. The Section in the Management Agreement labeled "other" contains unenforceable provisions under Tennessee law and the restraints on alienation are illegal and thus unenforceable; and

6. Any other declaratory judgment relief the Plaintiff is entitled to.

[Doc. 7 p. 2].

Plaintiff asserts that it is entitled to a declaratory judgment, arguing that the relevant factors weigh in its favor [Doc. 13 pp. 11–12]. It claims that "[a] declaratory judgment is essential in this case to determine the enforceability of the disputed contract provisions, including the expired . . . ELA and the specific clauses in the Management Agreements" [*Id.* at 11].

Defendants respond that "[a] declaratory judgment as to the parties' rights and obligations under the Management Agreements would be premature at this time" [Doc. 19 p. 17]. They assert

that they "have not had the opportunity to develop the record or engage in discovery, and declaratory relief would decide issues of fact pertinent to claims asserted by both parties" [*Id.*]. Stating that they intend to assert a counterclaim for Plaintiff's breach of the Management Agreements, Defendants argue that "determining the parties' rights without considering [their] counterclaim would be a waste of the parties' and judicial resources at this juncture" [*Id.*]. With respect to Plaintiff's request for a declaratory judgment relating to the Tennessee Real Properties Records Integrity Act, Defendants state that it only covers residential real estate, and therefore, it is not applicable here [*Id.* at 21–22].

Pursuant to 28 U.S.C. § 2201, "upon the filing of an appropriate pleading, [the Court] may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Section 2201 further provides that "[a]ny such declaration shall have the force and effect of a final judgment and shall be reviewable as such." *Id.* "The 'useful purpose' served by the declaratory judgment action is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing." *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004).

The United States Sixth Circuit Court of Appeals has articulated five factors for a court to use in determining whether to enter a declaratory judgment:

> (1) whether the declaratory action would settle the controversy; (2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue; (3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata;" (4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach upon state jurisdiction; and (5) whether there is an alternative remedy which is better or more effective.

9

*Grand Trunk W. R. Co. v. Consol. Rail Corp.*, 746 F.2d 323, 326 (6th Cir. 1984). These are known as the *Grand Trunk* factors. "[The Sixth Circuit] has 'never assigned weights to the *Grand Trunk* factors when considered in the abstract' and the factors are not always considered equally." *Cardinal Health, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 29 F.4th 792, 797 (6th Cir. 2022) (quoting *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 759 (6th Cir. 2014)).

Courts generally analyze the first two factors collectively. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 557 (6th Cir. 2008) ("The second factor in the *Grand Trunk* analysis is closely related to the first factor and is often considered in connection with it. Indeed, it is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue." (citations omitted)); *Travelers Indem. Co. v. Bowling Green Pro. Assocs., PLC*, 495 F.3d 266, 272 (6th Cir. 2007) (analyzing these factors together). Plaintiff asserts that "[t]his judgment would resolve the central controversy by providing a definitive legal ruling on whether these provisions are valid under Tennessee law" [Doc. 13 p. 11]. In addition, Plaintiff states that a declaratory judgment "would clarify the legal rights and obligations of both parties, particularly informing the Plaintiff[] that [it] can proceed with the sale of the properties[] and retain control of the properties" [*Id.*].

Defendants respond that these factors weigh against entering a declaratory judgment because the parties have "opposing views to which interpretation would settle the controversy" [Doc. 19 p. 18 (citation omitted)]. Defendants state that the controversy would not be settled given that Plaintiff alleges "other fact dependent causes of action" [*Id.*]. At the hearing, Defendants noted that their answer is due in November 2024, and they intend to file counterclaims. They claim that a declaratory judgment is "unjustified at this time" because "Plaintiff is seeking a declaratory

judgment [that] will ultimately determine liability on claims [that] have already accrued" [*Id*. at 19].

Plaintiff replies that its declaratory relief does not seek relief for past harms, but instead, it will "allow [it] to exercise [its] property rights over [its] real properties without interference from the Defendants" [Doc. 22 p. 3]. According to Plaintiff, it "is not asking the Court to rule on or litigate the entire merits of the case or grant every request for relief in the Complaint" [*Id*. at 4]. Instead, Plaintiff seeks "control of the properties and [to] sever the management relationship between the parties while the litigation, with the remaining rights and obligation[s] of the parties to be determined at a later date" [*Id*.].

The undersigned finds the declaratory judgment would not settle the controversy and would not serve a useful purpose in clarifying the legal relations in issue. Plaintiff's request for declaratory judgment seeks to declare the parties' rights and obligations under the Management Agreements and under the ELA, but Plaintiff alleges various other fact-dependent causes of action, such as professional negligence, negligent misrepresentation, violations of the Tennessee Real Estate Commission Rules and Guidelines, and the Tennessee Consumer Protection Act. *See Grimm v. Shroyer*, 35 F. Supp. 2d 966, 973 (E.D. Ky. 1999) (declining to exercise discretion under the Declaratory Judgment Act where a finding that that statute at issue is unconstitutional would not settle the entire controversy between the parties because they still had disputes that "would not be affected by the declarations requested"). Further, it would not resolve Defendants' anticipated counterclaims. *See Guild Assocs., Inc. v. Bio-Energy (Washington) LLC*, No. 2:13-CV-1041, 2015 WL 13034879, at *7 (S.D. Ohio Feb. 12, 2015) (declining to issue a declaratory judgment where it "would not resolve [the defendant's] counterclaims regarding fraud in the inducement or breach of the . . . purchase order").

11

Moreover, to the extent Plaintiff seeks a declaratory judgment that Defendants are not entitled to the commission for sale of the Laurelwood property, such a judgment would constitute "an ultimate determination of liability on an already-accrued damages claim[,]" which "weighs heavily" against entering a declaratory judgment. *AmSouth Bank*, 386 F.3d at 786. Indeed, Plaintiff seeks damages in this case for breach of contract, so a declaratory judgment would not resolve the matter [Doc. 1 pp. 25–26]. *See Gregor v. Rice Drilling D, LLC*, No. 2:21-CV-3999, 2024 WL 169119, at *4 (S.D. Ohio Jan. 16, 2024) ("[I]ssuing a declaratory judgment would not settle the parties' controversy and would not be useful in clarifying the legal relations at issue, as [the p]laintiffs seek damages for Defendants' alleged breach of the Smith-Goshen Leases. The adjudication of [the p]laintiffs' breach of contract claim will necessarily decide the status of the contractual relationship." (citation omitted)); *Little Mountain Precision, LLC v. DR Guns, LLC*, No. 22 CV 1471, 2023 WL 1816711, at *5 (N.D. Ohio Feb. 8, 2023) ("Issuing a declaratory judgment would not settle the parties' controversy, as plaintiff also seeks damages as a result of the [c]orporate [d]efendants' alleged breach of the Force Majeure Agreements."). And further, a declaratory judgment would not clarify the legal relations between the parties here "[b]ecause granting Plaintiff's request will require the resolution of disputed questions of fact, [and] a declaratory judgment at this stage of the proceeding, with an undeveloped record, would be premature." *Royster v. Riley*, No. 206-CV-293, 2007 WL 1595423, at *1 (W.D. Mich. May 31, 2007) (denying the plaintiff's motion for declaratory judgment).[2]

---

[2] The record is legally undeveloped at this time. Plaintiff seeks a declaratory judgment that the Management Agreements are enforceable under the Tennessee Real Property Records Integrity Act [Doc. 7 p. 2]. Defendants respond that this "Act applies to contracts 'pursuant to which a person agrees to provide services in connection with the sale of residential real estate or the sale of any product or the performance of any personal service on or for the maintenance of residential real estate'" [Doc. 19 pp. 20–22 (emphasis omitted) (quoting Tenn. Code Ann. § 66-33-102(4))].

Factor three—whether the declaratory remedy is being used for the purpose of procedural fencing—is neutral here. There is no evidence that Plaintiff is using its request for a declaratory judgment for this purpose. *See W. World Ins. Co.*, 2013 WL 5372769, at *4 ("Courts are reluctant . . . to impute an improper motive to a plaintiff if there is no evidence of one in the record." (citing *Scottsdale Ins. Co.*, 513 F.3d at 558)); *see also United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 399 (6th Cir. 2019) ("If there is no evidence of procedural fencing, we often find that the factor is 'neutral,' and "does not point toward *denying* jurisdiction[.]" (citations omitted)); *Wilmington Sav. Fund Soc'y, FSB v. Kattula*, No. 16-CV-12813, 2024 WL 3160320, at *10 (E.D. Mich. June 25, 2024) (finding the third factor neutral because there was no evidence of procedural fencing).

The fourth factor, increasing the friction between state and federal courts and improperly encroaching upon state jurisdiction, is either neutral or not relevant as there is no underlying state proceeding. *See Wilmington Sav. Fund Soc'y, FSB*, 2024 WL 3160320, at *11 (finding that the fourth factor either supports the exercise of jurisdiction or is not relevant because the issues did not involve difficult questions of state law and there was not a separate state case pending).

With respect to the remaining factor—whether there is an alternative remedy that is better or more effective—the parties do not sufficiently address this factor. While this case appears to be based solely on state law, "it is not clear that the state court would provide a better or more effective remedy." *Id*. at *12.

---

"[Because] the Management Agreement[s] are used for commercial purposes[,]" Defendants assert this Act is not applicable [*Id*.]. Plaintiff does not respond to this argument.

Considering and weighing these factors, and considering that the record is underdeveloped, the undersigned finds that the *Grand Trunk* factors weigh against entering the declaratory judgment at this stage.[3]

## III. INJUNCTIVE RELIEF

Plaintiff seeks the following injunctive relief: (1) "[r]estoration of the stolen funds from Plaintiff's trust account in the amount of $20,333.63;" (2) "[a]n order preventing Defendants from withdrawing any further funds from the Plaintiff's trust accounts, profits, or escrow accounts;" (3) "[a]n order to require the Defendants to provide a full accounting of all finances related to the Plaintiff's properties; (4) "[a]n order for the immediate return of control over Plaintiff's properties from the Defendants back to Plaintiff;" (5) "[a]n order preventing Defendants from interfering with the sale or management of Plaintiff's properties;" and (6) "[a]ny other relief the Court deems proper." [Doc. 13 pp. 22–23]. Plaintiff also seeks a "temporary restraining order preventing Defendants from[] . . . removing any more money from Plaintiff's trust accounts and profits[]" and "any other temporary restraining order relief the Plaintiff is entitled to" [*Id.*].

"Under Federal Rule of Civil Procedure 65, a party may seek injunctive relief if it believes it will suffer irreparable harm or injury during the pendency of the action." *F.S. Sperry Co. v. Schopmann*, 304 F. Supp. 3d 694, 700 (E.D. Tenn. 2018). "If a defendant is on notice . . . a request for a temporary restraining order may be treated as a motion for a preliminary injunction." *Id*. At the hearing, Plaintiff acknowledged that because Defendants had notice of the motion, its request for a temporary restraining order became one for a preliminary injunction. The undersigned will treat Plaintiff's motion as such for purposes of this Report and Recommendation.

---

[3]    Defendants noted at the hearing that Plaintiff's concerns regarding its property can be addressed by expediting the schedule. To the extent an expedited schedule is warranted, the undersigned recommends that the parties discuss it at their Rule 26(f) conference.

14

There are four factors courts weigh in determining whether to grant preliminary injunctive relief:

> (1) whether plaintiff "has shown a strong likelihood of success on the merits"; (2) whether plaintiff will suffer irreparable injury in the absence of an injunction; (3) whether the injunction will cause substantial harm to others; and (4) whether the injunction would serve the public interest.

*Ross v. Parrish*, No. 3:23-CV-15, 2023 WL 2484775, at *5 (E.D. Tenn. Mar. 13, 2023) (quoting *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002)). The moving party bears the burden to show the factors weigh in its favor. *Volkswagen Grp. of Am. Chattanooga Operations, LLC v. SK Battery Am., Inc.*, No. 1:23-CV-246, 2024 WL 718170, at *2 (E.D. Tenn. Jan. 10, 2024). "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet*, 305 F.3d at 573 (citation omitted). This burden is a "heavy one," *Hum. Rts. Def. Ctr. v. Winn*, 431 F. Supp. 3d 925, 943 (E.D. Mich. 2020), and "is much more stringent than the proof required to survive a summary judgment motion," *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) (citations omitted).

## A.    Likelihood of Success on the Merits

Plaintiff states that it has demonstrated the likelihood of success for its claims of breach of contract, conversion, professional negligence, negligent misrepresentation, and violations of the Tennessee Real Estate Commission Rules and Guidelines, the Tennessee Consumer Protection Act, the Tennessee Real Estate Broker's Act for Vacation Lodging Services, and the Tennessee Real Estate Broker's Act [Doc. 13 pp. 12–17].

15

Defendants respond that this factor weighs in their favor because, Plaintiff "is relying on unverified and controverted allegations as the sole basis for its injunctive relief" [Doc. 19 p. 11]. And the affidavit, Defendants state, "was sworn to by Plaintiff's counsel" [*Id.*]. Further, Defendants argue, the affidavit addresses only Defendants' withholding of $20,333.35 [*Id.* at 12 (citation omitted)]. In other words, Defendants respond that Plaintiff has not offered any proof, and therefore, it cannot establish its burden [*Id.* at 11–12]. They also outline each claim, arguing why Plaintiff cannot show that it has a likelihood of success [*Id.* at 12–17].

"A party . . . is not required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (citation omitted). Even so, "a plaintiff must show more than a mere possibility of success." *F.S. Sperry Co.*, 304 F. Supp. 3d at 701 (quoting *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II*, 119 F.3d at 402.

Plaintiff has not shown it has a likelihood of success "by an affidavit, declaration, or any type of actual evidence." *Taylor v. Wellpath Med.*, No. 3:22-CV-00705, 2023 WL 2923137, at *2 (M.D. Tenn. Apr. 11, 2023) (recommending denial of the plaintiff's motions for preliminary injunction because he did not file any proof), *report and recommendation adopted*, No. 3:22-CV-00705, 2023 WL 4674300 (M.D. Tenn. July 20, 2023); *see also Hum. Rts. Def. Ctr.*, 431 F. Supp. 3d at 943 (explaining that the plaintiffs "must affirmatively demonstrate their entitlement to injunctive relief"). Instead, Plaintiff's proof comes from an affidavit by its counsel, Attorney Anderson, who states, "In August 2024, Defendants unilaterally withheld $20,333.63, from the Plaintiff's trust account, as documented in the Plaintiff's annual statement for alleged

16

'breach of contract'" [Doc. 7 p. 6]. At the hearing, Plaintiff noted that Defendants submitted proof to support this assertion and that there is no dispute that it occurred.

According to the Declaration of Shawn Spiezio, "In response to [Plaintiff's] breach of the Agreement, [Defendant AB] asserted its right to recover the gross rent it was otherwise entitled to receive by deducting that amount from rents received from other properties it manages for [Plaintiff]" [Doc. 20 ¶ 13]. He states that "[i]n August 2024, a total of $20,333.63 was deducted from revenue received for other [Plaintiff] properties managed by [Defendant AB] to pay for amounts owed for the early termination of the Agreement for the Laurelwood property" [*Id.*]. Defendant Shawn Spiezio states that Defendant AB had a "good faith belief" that it was entitled to the funds, but regardless, it returned them [*Id.*].

Plaintiff relies on this proof to primarily support its claims for breach of contract and conversion [*See* Doc. 13 p. 13]. But even considering Defendant Shawn Spiezio's statements, Plaintiff has not made a strong showing that it will be successful on these claims. For instance, a plaintiff asserting a claim for conversion must show that the defendant had "an intent to exercise dominion and control over the property that is in fact inconsistent with the plaintiff's rights." *Mammoth Cave Prod. Credit Ass'n v. Oldham*, 569 S.W.2d 833, 836 (Tenn. Ct. App. 1977) (citation omitted). The only evidence before the Court is that Defendant AB deducted the amount for Plaintiff's early termination of the Management Agreement on the Laurelwood property; there is no evidence at this time that Defendant AB's actions were inconsistent with Plaintiff's rights. And Defendants returned the money on September 6, 2024.

To the extent Defendant AB's deduction constituted a breach of contract, there is no dispute that Defendant AB returned the funds and therefore cured the breach. *See Spec's Fam. Partners, Ltd. v. First Data Merch. Servs. Corp.*, No. 214CV02995, 2017 WL 4547168, at *5 (W.D. Tenn.

17

July 7, 2017) ("A party may cure a material breach by 'engag[ing] in subsequent conduct that substantially performs or performs without a material failure.'" (quoting *Anacapa Tech., Inc. v. ADC Telecomms., Inc.*, 241 F. Supp. 2d 1016 (D. Minn. 2002))), *aff'd sub nom.*, *Spec's Fam. Partners, Ltd. v. First Data Merch. Servs. LLC*, 777 F. App'x 785 (6th Cir. 2019). And there are allegations that Plaintiff breached first, meaning Plaintiff may not be entitled to damages. *See McClain v. Kimbrough Constr. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990) ("A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract."). Plaintiff has not addressed these defenses, which suggest that it may not be likely for Plaintiff to succeed on this claim.

Plaintiff did not submit any proof supporting its remaining claims.[4] The undersigned therefore finds that Plaintiff has not shown a strong likelihood of success on the merits.

## B.     Irreparable Harm

Plaintiff claims that without a preliminary injunction, it will sustain "irreparable injury that cannot be fully compensated by monetary damages" [Doc. 13 p. 18]. "If the Defendants are not enjoined from further accessing the Plaintiff's trust accounts," Plaintiff states that it "will likely continue to experience unauthorized withdrawals and misappropriation of funds" [*Id.*]. Such actions, Plaintiff asserts, "will deplete [its] financial resources[,]" meaning that it "could lead to

---

[4]      It is not clear to the undersigned whether Plaintiff relies on Defendant AB's deduction of money to support its claims of professional negligence and violations of the Tennessee Real Estate Broker Act for Lodging Services and the Tennessee Real Estate Broker Act [*See* Doc. 13 pp. 14–17]. Regardless, Plaintiff has not developed these arguments. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("'[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (alteration in original) (quoting *Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*, 59 F.3d 284, 293–94 (1st Cir.1995))). And Defendants persuasively argue why Plaintiff has not shown a strong likelihood of success on the merits of these claims at this time [*See, e.g.*, Doc. 19 pp. 16–17 (explaining that there is no proof that Defendant AB withdrew the funds under "false pretenses")].

18

defaults on loan obligations and failure to make mortgage payments for the Properties" [*Id*.]. Plaintiff claims that "Defendants will interfere with the management of [its] properties" [*Id*. at 19]. It contends that its "reputation in the rental market is also at risk" because "Defendants' mismanagement and potential neglect of the properties could result in negative reviews, canceled bookings, and a tarnished reputation" [*Id*.]. Such injuries, Plaintiff argues, "cannot be quantified financially, and its effects could persist long after the immediate financial issues are resolved" [*Id*.]. "Moreover," Plaintiff argues, it "faces the very real possibility of losing control and access to [its] properties" [*Id*.]. According to Plaintiff, it "may be forced to take drastic and disruptive measures to regain control over [its] properties, such as changing locks or terminating contracts unilaterally, which could lead to further disputes, legal complications, and additional harm to the Plaintiff's business relationships and reputation" [*Id*.].

Defendants respond that "[i]njunctive relief is not appropriate because [Plaintiff] is not facing any imminent, actual threat of injury" [Doc. 19 p. 5]. "[Its] alleged chief injury, funds in the amount of $20,333.36 removed from the owner trust account," Defendants submit, "have already been returned to them" [*Id*. at 6–7]. Defendants have also sworn "that they will not remove any further funds during the pendency of this litigation" [*Id*. at 6]. Defendants contend that "[t]he withdrawal of the trust funds could be remedies through the payment of money" [*Id*.]. According to Defendants, "[w]hen the relief sought for a preliminary injunction is already provided, there is no live controversy that requires judicial intervention" [*Id*. at 9 (citations omitted)].

With respect to any "threat to [Plaintiff's] business operations" due to "Defendants' control of the properties[,]" Defendants assert that "[t]he loss of business opportunities or future income is exactly the type of economic injury which is compensable by monetary damages" [*Id*. at 7]. According to the Declaration of Shawn Spiezio, "Between September 17, 2024, and January 1,

2025," [the relevant properties] have a combined 40 pending reservations booked through [Defendant AB,]" which exceeds $80,000 in revenue [Doc. 7 ¶ 11].[5] Defendants state that Plaintiff's allegation "that its reputation in the rental market is 'at risk[,]'" is speculative [Doc. 19 p. 8]. Defendants deny that an injunction would maintain the status quo, but instead, argue that it would "prevent [them] from fulfilling their obligations and receiving compensation under the contract at issue" [*Id*. at 10].

Plaintiff replies that "[D]efendants so-called 'cure' does not negate the fact that a breach and theft of money occurred" [Doc. 22 p. 2]. This taking of money, Plaintiff submits, "has destroyed any remaining trust Plaintiff has in Defendants to act as [its] fiduciary and agent for the management of [its] properties" [*Id*.].

"A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Overstreet*, 305 F.3d at 578 (citation omitted); *see also Towerco 2013, LLC v. Berlin Twp. Bd. of Trustees*, 110 F.4th 870, 889 (6th Cir. 2024) ("However, 'mere economic loss does not constitute irreparable injury,' because it is compensable by damages." (quoting *Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 291 (6th Cir. 1987))). Here, Plaintiff's primary harm is the alleged "unauthorized withdrawal and misappropriation of funds" [Doc. 13 p. 18]. But this harm is economic, and Defendant AB has returned the money and declares "it will not take any further unilateral deductions" [Doc. 20 ¶ 14]. *See Wilburn v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, No. 2:23-CV-13170,

---

[5]       In Defendants' brief, they state that "[Defendant AB] has secured 38 bookings at the subject properties that will generate a total of $110,000 in revenue between now and January 1, 2025" and that "[a] total of 352 nights have been booked at the properties through the end of the year" [Doc. 19 p. 8]. At the hearing, Defendants noted that there are 40 reservations, as noted in Defendant Shawn Spiezio's declaration, and that the latter statement pertains to the related case, *DG Smoky, LLC v. Aunt Bug's Cabin Rentals LLC*, No. 3:24-cv-364.

20

Case 3:24-cv-00354-TAV-JEM    Document 25    Filed 10/04/24    Page 20 of 23
PageID #: 341

2024 WL 3488724, at *1 (E.D. Mich. July 18, 2024) (finding the plaintiff's motion for preliminary injunction moot because the defendant provided him with the relief sought); *D.P. Dough Franchising, LLC v. Southworth*, No. 2:15-CV-2635, 2017 WL 4315013, at *15 (S.D. Ohio Sept. 26, 2017) (finding there was no irreparable harm because the defendant ceased the infringing activity); *see also Montgomery v. Carr*, 848 F. Supp. 770, 779 (S.D. Ohio 1993) ("The term "status quo", however, must serve the primary purpose of preliminary injunction: to preserve the parties' relative positions in order to prevent irreparable injury prior to trial." (citation omitted)). The undersigned therefore finds Plaintiff's request for a preliminary injunction related to the alleged unauthorized withdrawal without merit.

Plaintiff also claims that Defendants will "interfere with the management of [its] properties," which "will result in physical deterioration of the properties, decreased marketability, and diminished rental income[,]" causing "disrupt[ion] to [Plaintiff's] business operations" [Doc. 13 p. 19]. At the hearing, Plaintiff noted that disruption to its businesses could cause it to default on its loans. But the loss of business opportunities or future income is an economic injury that can be compensable by monetary damages. *See S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991) (affirming the district court's decision not to enter a preliminary injunction, noting that the district court found that "while [the plaintiff] may lose customers for its milk, there was no showing that the market was so limited that the damage would be irreparable"); *Tenn. v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-33, -- F. Supp.3d --, 2024 WL 464164, at *5 (E.D. Tenn. Feb. 6, 2024) (finding the plaintiffs' claim that they will receive less money does not constitute the irreparable harm required for a temporary restraining order);[6] *Mount Clemens Inv. Grp., L.L.C.*

---

[6]     In this case, the Court later granted an injunction because "a judgment in favor of [the p]laintiffs at the conclusion of this lawsuit will not make student-athletes whole." *Tenn. v. Nat'l Collegiate Athletic Ass'n*, No. 3:24-CV-33, 2024 WL 755528, at *5 (E.D. Tenn. Feb. 23, 2024).

*v. Borman's Inc.*, No. 10-12679, 2010 WL 3998095, at *5 (E.D. Mich. Oct. 12, 2010) ("Since Plaintiff has not persuaded the Court that the Shopping Center is anything but an investment and that the Shopping Center is not so unique to call for a preliminary injunction, Plaintiff has not shown that the Shopping Center's loss would cause it an irreparable harm.").

Plaintiff further claims that its "reputation in the rental market is also at risk" and that it "faces the very real possibility of losing control and access to [its] properties" [Doc. 13 p. 19]. Plaintiff has not offered any evidence of these harms; therefore, they are speculative. *See Towerco 2013, LLC*, 110 F.4th at 888 ("This purported harm [of skepticism that it will not be a reliable partner] is far from 'certain and great,' as required for this second prong, but rather is more accurately described as 'speculative or theoretical.'" (quoting *Ohio ex rel. Celebrezze*, 812 F.2d at 290); *Thompson v. Hayes*, 748 F. Supp. 2d 824, 832 (E.D. Tenn. 2010) ("[The] plaintiffs' allegations of reputational harm are not supported by the record. Plaintiff submitted no evidence to the Court demonstrating their reputation has been diminished by defendant's actions[.]"). And Defendants have presented evidence that Defendant AB has continued to book reservations [Doc. 50 ¶ 11].

The undersigned therefore finds that Plaintiff has not established that it will be irreparably harmed in absence of a preliminary injunction. Because of this finding, the undersigned need not consider the remaining factors.[7] *See Volkswagen Grp. of Am. Chattanooga Operations*,

---

The Court reasoned that student athletes have a short time to negotiate his/her unique name, image, and likeness ("NIL") value and that this short window was when the student had "the most negotiating leverage with NIL collectives and the best chance to realize their true NIL value." *Id*. Such is not the case here where there is no evidence that "keeping the Defendants as property managers for [the] duration of the Management Agreements will . . . cause the Plaintiff[] to lose any negotiation leverage on a unique asset" [Doc. 19 p. 7 n.1].

[7]      With respect to the factor concerning harm to other persons, Defendants argue that terminating the Management Agreements places the existing reservations at risk [Doc. 19 p. 8]. They claim, "The failure to honor those reservations and/or the failure to perform all the necessary

2024 WL 718170, at *2 ("[T]he irreparable harm factor is 'dispositive,' eliminating the need for consideration of the other factors in its absence." (quoting *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019)).[8]

## IV.   CONCLUSION

For the reasons explained above, the undersigned **RECOMMENDS**[9] that the District Judge **DENY** Plaintiff's Motion for Declaratory Judgment and Preliminary Injunction and/or Temporary Restraining Order [**Doc. 7**].

Respectfully submitted,

Jill E. McCook
United States Magistrate Judge

---

task to ensure the guests enjoy their stay will cause greater damage to both the [P]laintiff[] and [Defendant AB]" [*Id.*]. Plaintiff replies that "these reservations can be seamlessly transferred to a new property management company[,]" which is a "standard practice" [Doc. 22 p. 5]. It states that "as the property owner, Plaintiff has the exclusive right to cancel these bookings if necessary and at the discretion of the Plaintiff as the property [owner]" [*Id.*]. To the extent Plaintiff would cancel these bookings, this factor would weigh against entering an injunction. *Cf. Cellnet Commc'ns, Inc. v. New Par*, 291 F. Supp. 2d 565, 571 (E.D. Mich. 2003) ("It appears that no third party would be substantially harmed by the issuance of a preliminary injunction in this matter. If an injunction issued, cellular service to customers would continue and would be unaffected by the injunction.").

[8]   The undersigned does not need to address the Plaintiff's request for a bond in light of the recommendation. *See Cellnet Commc'ns, Inc. v. New Par*, 291 F. Supp. 2d 565, 573 (E.D. Mich. 2003) ("As the Court will deny the motion for a preliminary injunction, the Court does not need to address the issue of a security pursuant to Rule 65 of the Federal Rules of Civil Procedure.").

[9]   Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Federal Rule of Civil Procedure 72(b). Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 153-54 (1985). "[T]he district court need not provide *de novo* review where objections [to the Report and Recommendation] are '[f]rivolous, conclusive or general.'" *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (quoting *Nettles v. Wainwright*, 677 F.2d 404, 410 n.8 (5th Cir.1982)). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs.*, 829 F.2d 1370, 1373 (6th Cir. 1987).

23