UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

DCJM, LP,                                    )
                                             )
                Plaintiff,                   )
                                             )
v.                                           )          No.:   3:24-CV-354-TAV-JEM
                                             )
AUNT BUG'S CABIN RENTALS, LLC,               )
BRIAN SPIEZIO, SHAWN SPIEZIO, and            )
MIGHTY PEAKS REALTY, LLC                     )
                                             )
                Defendants.                  )

## MEMORANDUM OPINION AND ORDER

This civil matter is before the Court on defendants' Partial Motion to Dismiss [Doc.

26] and plaintiff's Motion to Dismiss Defendants/Counter-Plaintiffs Counter-Complaint

[Doc. 31 (as amended by Doc. 39)].  Plaintiff responded to defendants' motion [Doc. 34]

after filing an amended complaint [Doc. 33].  Defendants responded in opposition to

plaintiff's motion [Doc. 36 (as amended by Doc. 42)].  Accordingly, this matter is now ripe

for the Court's review.  *See* E.D. Tenn. L.R. 7.1(a).  For the reasons discussed below,

defendants' Partial Motion to Dismiss [Doc. 26] will be **DENIED as moot** and plaintiff's

Motion to Dismiss Defendants/Counter-Plaintiffs Counter-Complaint [Doc. 31 (as

amended by Doc. 39)] will be **GRANTED in part** and **DENIED in part**.  Specifically,

Count I of defendants' Countercomplaint will be **DISMISSED in part** and Count II will

be **DISMISSED** in its entirety.

## I.    Background[1]

This dispute arises from the circumstances surrounding defendants' management and rental of plaintiff's investment properties: five luxury cabins in Eastern Tennessee.

Plaintiff DCJM, LP, a Texas Limited Partnership, is a real estate investment company that buys and holds real estate [Doc. 33 ¶¶ 1, 9].  Relevant to the instant pending motions, plaintiff owned one such investment property located at 3103 Laurelwood Lane, Sevierville, Tennessee 37862 (the "Laurelwood property") [*Id.* ¶ 10].

Defendant Aunt Bug's Cabin Rentals, LLC ("AB"), a Tennessee limited liability company, provides services for the management and rental of luxury cabins on behalf of property owners through which it earns a commission [*Id.* ¶¶ 2, 11].  Defendant Mighty Peaks Realty, LLC ("MP") is also a Tennessee limited liability company and a Tennessee licensed real estate brokerage, which defendants describe as the "on-site real estate company" for AB [*Id.* ¶¶ 5, 12; Doc. 35 ¶ 19].  Defendants Brian Spiezio and Shawn Spiezio are licensed Tennessee real estate brokers who work for MP [Doc. 33 ¶¶ 12–13].

Between 2018 and 2022, plaintiff and AB entered into several contracts for the management of plaintiff's properties, copies of which appear to be attached to the amended complaint [*Id.* ¶ 14; Doc. 33-1].  Of relevance to the instant motions, the parties entered into an agreement concerning the Laurelwood property on December 20, 2021, with an

---

[1]    The Court presumes familiarity with the background contained in United States Magistrate Judge Jill E. McCook's Report and Recommendation [Doc. 25], which the Court accepted and adopted [Doc. 30].  Here, the Court summarizes background information relevant to the instant pending motions before the Court.

2

initial duration until December 31, 2025 [Doc. 33-1, p. 8]. However, based upon a "limited-time promotion" that plaintiff elected, defendant alleges that this term was extended through December 31, 2027, in exchange for a larger proportion of gross rent [*Id.* at 10; Doc. 35 ¶ 14]. The agreement initially states that "[i]f cabin is listed for sale, then Owner must notify the company within 10 days in writing of official listing" [Doc. 33-1, p. 8]. It further provides that "Owner may use Company's in-house licensed real estate company for listing services, as necessary" [*Id.*].

In subsequent provisions, the agreement provides additional terms concerning the event of a mid-term sale. At paragraph four, the agreement reiterates the ten-day written notice requirement if the cabin is listed for sale, as well as stating that "Owner may elect to go with on-site real estate company to coordinate showings & rental bookings more seamlessly" [*Id.*]. At the end of the agreement, under the subheading "Other," the agreement provides that "Owner to require new Buyer to honor management contract the remaining term of rental agreement, if property sold on the real estate market" [*Id.* at 10]. The phrase "on the real estate market" appears to contrast with an earlier provision regarding termination, which states that "[t]his agreement . . . may be terminated . . . in the event the cabin is sold with on-site real estate office" [*Id.* at 9]. The agreement further states that "On-site real estate company will list property for Sale, if & when Owner desires Sale during the term of the rental contract at market-best commission rate" [*Id.* at 10].

Plaintiff decided to list the Laurelwood property for sale in late 2022, prior to the expiration of the parties' agreement [Doc. 33 ¶ 20]. It alleges that, after agreeing to use

3

MP as the real estate brokerage for this sale, defendant Brian Spiezio received an offer of approximately $450,000 from a potential buyer for the Laurelwood property [*Id*. ¶¶ 24, 26]. However, he did not disclose this offer to plaintiff because the potential buyer was unwilling to retain AB as their property manager [*Id*. ¶¶ 27, 31]. Plaintiff alleges that Spiezio refused to entertain other potential offers on the same grounds [*Id*. ¶ 33]. Ultimately, plaintiff sold the Laurelwood property on July 30, 2024, without using MP's real estate brokerage services [*Id*. ¶¶ 109–10]. The new buyer of the Laurelwood property did not agree to use AB for its property management services [*Id*. ¶ 112].

Although the instant pending motions center on the events surrounding the sale of the Laurelwood property, plaintiff alleges that defendants committed a range of misconduct with respect to its other rental properties. For example, plaintiff alleges that AB improperly billed it for services [*Id*. ¶¶ 36–43], that AB misappropriated money and used an unlicensed contractor [*Id*. ¶¶ 44–101], and that AB stole trust money from plaintiff [*Id*. ¶¶ 113–22].

Plaintiff brings claims[2] for breach of contract (Count II), conversion (Count III), professional negligence (Count IV), negligent misrepresentation (Count V), negligence per se (Counts VI, VII), violations of the Tennessee Consumer Protection Act (Counts VIII, IX), and violations of the Tennessee Real Estate Broker License Act (Count X) [*Id*. ¶¶ 133–211]. In their countercomplaint, defendants allege that by failing to use MP as its listing agent and/or selling to a buyer who refused to honor the rental agreement through

---

[2] Plaintiff's Count I, seeking declaratory judgment and preliminary injunctive relief, was the subject of its motion for such relief [Doc. 7], which the Court previously denied [Doc. 30].

4

the end of its term, plaintiff breached its contract with AB (Count I) and MP (Count II) [Doc. 35 ¶¶ 29–42, 43–59].[3]

## II.    Standard of Review

The parties have brought their respective motions to dismiss, in relevant part, under Federal Rule of Civil Procedure 12(b)(6).  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  "Although this standard does not require 'detailed factual allegations,' it does require more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action.'"  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Furthermore, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  This requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint that pleads facts "merely consistent with" liability, "stops short of the line between possibility and plausibility of entitlement to relief."  *Id.* (internal quotation marks omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*  Finally, "a claim has facial plausibility when the plaintiff pleads factual

---

[3]  Per the Order filed contemporaneously with this Memorandum Opinion and Order, defendants will be allowed to assert two additional counterclaims against plaintiff by way of amendment.  Defendants' proposed amendment [Doc. 44-1] does not substantively alter Counts I and II as analyzed in the instant Opinion.

5

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

In reviewing a motion to dismiss under Rule 12(b)(6), the Court "must construe the complaint in a light most favorable to plaintiffs [(or the pleading party, as the case may be)], accept all well-pled factual allegations as true, and determine whether plaintiffs undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 519 (6th Cir. 2008). However, the Court need not accept legal conclusions or unwarranted factual inferences as true. *Montgomery v. Huntington Bank*, 346 F.3d 693, 698 (6th Cir. 2003) (quoting *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

### III.   Analysis

#### A. Defendants' Partial Motion to Dismiss Plaintiff's Complaint

On November 7, 2024, defendants moved to dismiss Counts V, VI, and VII of the complaint [Doc. 26]. On November 27, 2024, plaintiff filed an amended complaint [Doc. 33]. In response to defendants' motion, plaintiff asserts that its amended complaint "directly addresses the alleged deficiencies raised in Defendant's [*sic*] motion" [Doc. 34]. Although the filing of an amended complaint typically moots a pending motion to dismiss, "[w]here portions of the original complaint and the amended complaint are substantially identical, a district court can apply the mooted motions to dismiss to the unchanged sections." *Hall v. Traditional Sporting Goods, Inc*., No. 3:23-CV-88, 2024 WL 3455250, at *1 (E.D. Ky. Jan. 30, 2024) (citing *Crawford v. Tilley*, 15 F.4th 752, 759 (6th Cir. 2021)).

6

Upon careful review of plaintiff's complaint and amendments thereto, the Court finds that plaintiff's numerous substantive modifications, additions, and deletions render defendants' original motion moot [*Compare* Doc. 1, pp. 17–20 *with* Doc. 33, pp. 20–25]. Accordingly, defendants' Partial Motion to Dismiss [Doc. 26] is **DENIED as moot** without prejudice to refile as to the amended complaint.

### B. Plaintiff's Motion to Dismiss Defendants' Counter-Complaint

### i. Dismissal of Count I as to AB

Plaintiff advances four arguments in favor of dismissing AB's breach of contract claim [Doc. 40, pp. 3–10]. First, it argues that defendants' attempt to enforce the Laurelwood agreement as to the new buyer amounts to an unreasonable restraint on alienation that violates Tennessee public policy [*Id*. at 3–4]. It points to a Tennessee statute that it argues codifies this public policy consideration [*Id*. at 4 (citing Tenn. Code Ann. § 66-33-103(a)(1))]. Plaintiff also describes defendants' argument on this point as treating the agreement as a restrictive covenant, which it contends is unenforceable as such [*Id*. at 4–5]. Second, plaintiff argues that selling the Laurelwood property does not amount to breach because the contract does not expressly forbid a sale during its term [*Id*. at 6]. Third, it contends that AB fails to allege sufficient factual information to support a claim for breach of the implied covenant of good faith and fair dealing [*Id*. at 8]. Fourth, plaintiff rejects defendants' request for fees under the contract as violative of Tennessee public policy [*Id*. at 9–10 (citing Tenn. Code Ann. § 66-37-103(2))].

7

Defendants respond in opposition, arguing first that plaintiff's cited Tennessee law is inapplicable as applied to commercial real estate [Doc. 42, p. 2]. They also contend that plaintiff's argument about a restrictive covenant is "a red herring" insofar as defendants are not seeking to enforce the agreement against the buyer, but rather against plaintiff [*Id.* at 3]. Instead, defendants characterize the provision as a restraint on use, which is not considered a restraint on alienation [*Id.* at 4]. Next, defendants counter plaintiff's suggestions that enforcing the agreement even after a transfer of ownership would be unconscionable by arguing that plaintiff is a sophisticated business entity that obtained its benefit of the bargain knowing such restrictions applied [*Id.* at 4–5]. They also reject plaintiff's argument against the implied covenant of good faith and fair dealing because this allegation is premised upon a breach of contract claim [*Id.* at 6].

### 1. Enforceability of the Laurelwood Agreement

The Court begins with the threshold issue of the Laurelwood agreement's enforceability, which plaintiff has challenged on public policy grounds. Specifically, the issue presented is whether Tennessee courts will enforce a contractual provision that requires a property owner to sell the property only to a buyer who will assume their contract with a service provider to the property. Because the Court has not been made aware of any Tennessee authority directly on point, "the Court must render a so-called 'Erie guess' as to how the Tennessee Supreme Court would rule if confronted with th[is] issue." *Adams v. Vanderbilt Univ.*, No. 3:23-CV-1, 2024 WL 1182861, at *7 (M.D. Tenn. Mar. 19, 2024) (slip opinion). "'Intermediate state appellate courts' decisions are also viewed as persuasive

unless it is shown that the state's highest court would decide the issue differently." *Id.* (quoting *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 762 (6th Cir. 2008)). When considering public policy arguments, Tennessee courts have generally enforced private contracts unless they "tend to harm or injure the public good, public interest or public welfare, or to violate the letter or the spirit of the Constitution, laws, common and statutory, or judicial decisions of the State." *Hoyt v. Hoyt*, 372 S.W.2d 300, 303 (1963). Additionally, "the purpose of a contract is important in the consideration of whether or not it violates public policy. *Id.* at 304 (citing *Lippman v. Boals*, 79 Tenn. 489 (1883)).

Turning first to the statute cited by plaintiff, Tennessee Code section 66-33-103 states that "[t]he public policy of this state favors the transferability of interests in real property free from unreasonable restraints on alienation and covenants or servitudes that do not touch and concern the property." Tenn. Code Ann. § 66-33-103(a)(1). Although the statute further provides that "[a] recorded service agreement violates this public policy," *id.* § 66-33-103(a)(2), subsequent provisions appear to limit the scope of this prohibition to "residential real estate," defined as "real property located in this state that is used primarily for personal, family, or household purposes." Tenn. Code Ann. §§ 66-33-103(b)(2), 66-33-102(3). Although plaintiff appears to acknowledge that the Laurelwood agreement does not fall within the statute's coverage [*See* Doc. 40, p. 5], the Court agrees with defendants that plaintiff's broader appeal to the public policy codified herein does not fully address the issue presented because of the statute's express confinement to recorded agreements concerning residential real estate [*See* Doc. 42, p. 3].

9

*Cf. Baugh v. Novak*, 340 S.W.3d 372, 385 (Tenn. 2011) ("A statute may still provide the basis for finding a contract unenforceable even if it does not specifically invalidate the contract or deprive the contracting parties of their right to pursue remedies if the contract is breached.").

Plaintiff's arguments likening the Laurelwood agreement to a restrictive covenant are similarly unpersuasive. Despite briefing the elements of a restrictive covenant, the parties ultimately appear to agree that the Laurelwood agreement does not bind subsequent grantees as a restrictive covenant, but rather operates as an ordinary contract [*See* Doc. 40, p. 5 ("Here, the Laurelwood agreement is purely a service agreement that defines rights and obligations for AB to manage the Laurelwood Property."); Doc. 42, p. 3 ("[Defendants have] not argued that the provision regarding subsequent buyers is a strict covenant or that the buyer is somehow bound by the Laurelwood Agreement.")]. Because neither party suggests that the Laurelwood agreement amounts to a covenant, several of plaintiff's citations are inapposite. *See, e.g.*, *Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 474 (Tenn. 2012) (affirming the "right to own, use, and enjoy private property" where restrictive covenants were at issue).

Despite the inapplicability of plaintiff's statutory and restrictive covenant citations, it is true that Tennessee courts "disfavor [ ] restraints on alienation of land, which are an inherent element in exclusive right of sale contracts," and have "generally tended to strictly construe brokerage contracts which attempt to eliminate the right of the owner to deal with his property without the aid of the broker." *Med. Park Hosp., Inc. v. Herman Walldorf &*

10

*Co.*, No. C/A 603, 1987 WL 15856, at *4 (Tenn. Ct. App. Aug. 18, 1987). Although the Tennessee Court of Appeals considered an exclusive right to sell contract in *Medical Park*, as opposed to the voluntary provision in the instant Laurelwood agreement, the court ultimately emphasized that "in this jurisdiction it is never presumed that the owner of property has deprived himself of the right to sell it." *Id*. at *5. In a different case, which the court framed as a "conflict [ ] between freedom of alienation and freedom of contract," the Court of Appeals held that "the law disfavors restraints on alienation, unless reasonable, and in close cases that construction will be adopted which most favors free alienability and the right to convey." *McGahey v. Wilson*, No. M2000-01931-COA-R3CV, 2001 WL 799736, at *4 (Tenn. Ct. App. July 17, 2001) (citing *First Fed. Sav. & Loan v. Perry's Landing*, 463 N.E.2d 636 (Ohio Ct. App. 1983)). In close cases where contractual and property rights conflict, therefore, it appears that Tennessee courts have tended to favor the result that honors a property owner's right to freely sell his property.

Defendants' citation to *Gilley v. Gilley*, No. M200900141COAR3CV, 2010 WL 199408, at *2 (Tenn. Ct. App. Jan. 20, 2010) does not disturb this general trend because the contract at issue in that case merely required divorcees to mutually consent to the sale of commercial property. The Tennessee Court of Appeals' determination that such a provision did not constitute an unreasonable restraint on alienation has little bearing on whether the provision at issue, which purports to limit the universe of potential buyers, would constitute such a restraint. *See id*. at *3.

11

If the Tennessee Supreme Court were confronted with the question of the Laurelwood agreement's enforceability, this Court suspects that it would decline to enforce the provision requiring a property owner to market and sell a property only to buyers willing to assume the owner's existing service contract. *See Adams*, 2024 WL 1182861, at *7. Although the statutes and case law cited by the parties do not speak directly to this issue, the weight of Tennessee authority appears to favor the right of property owners to freely alienate their property, even when that right potentially conflicts with certain contractual provisions. *See Med. Park Hosp.*, 1987 WL 15856, at *4; *McGahey*, 2001 WL 799736, at *4; *see also* Tenn. Code Ann. § 66-33-103(a)(1). Given that the Laurelwood agreement's subsequent-buyer obligation appears not to extend to a property owner who relies upon defendants' "on-site real estate office," [Doc. 33-1, p. 9], the apparent purpose of the provision is to punish a property owner who sells the property directly or through another real estate broker. *See Hoyt*, 372 S.W.2d at 304. Despite this disincentive, the contract repeatedly characterizes an owner's use of the "one-site real estate office" as optional. Whereas the contract first states that "Owner *may* use Company's in-house licensed real estate company for listing services, *as necessary*" [Doc. 33-1, p. 8 (emphasis added)], it later states that "Owner to require new Buyer honor management contract the remaining term of rental agreement, *if property sold on the real estate market*" [Doc. 33-1, p. 10 (emphasis added)]. Given that a Tennessee court rejected a similar restraint in an exclusive right of sale contract, it seems all the more likely that it would reject a provision that, as here, the does not consistently or clearly describe the property owner's agreement

12

to disregard a subset of potential buyers who may not wish to assume the Laurelwood agreement through its term. *Med. Park Hosp.*, 1987 WL 15856, at *4 (emphasizing principles of free alienability where the contract at issue expressly conveyed an exclusive right of sale). Having determined that this provision of the Laurelwood agreement likely violates Tennessee public policy, however, does not dictate that Count I of defendants' countercomplaint be dismissed in its entirety.

Although the parties appear to conflate plaintiff's alleged breach of the Laurelwood agreement on grounds of plaintiff's early termination and selling to a buyer who refused to assume the agreement, the Court views these allegations as separate and distinct theories of breach [*See* Doc. 35 ¶ 35 (emphasis added) ("DCJM's early termination of the Laurelwood Agreement *and* sale to a buyer who refused to assume or otherwise honor the Laurelwood Agreement *are* material breaches[.]"). Therefore, while the foregoing analysis dictates that plaintiff's alleged breach for failure to select a buyer who would assume the agreement should be dismissed as violative of Tennessee public policy, this analysis does not preclude defendants' allegation that plaintiff breached the agreement by prematurely terminating the Laurelwood agreement, which is the subject of the Court's next analysis.

### 2. Whether Early Termination May Constitute Breach

The Laurelwood agreement contains several provisions relating to the contract's duration and the potential for early termination. First, it states that the agreement "shall terminate on 12/31/25 unless cancelled after the twenty-four month term minimum, with a

13

ninety day written notice by either party" [Doc. 33-1, p. 8].[4]  Additionally, in the same paragraph, the agreement states that "[i]f cabin is listed for sale, then Owner must notify the company within 10 days in writing of official listing" [*Id*.].  The contract further provides that this written notice must be "delivered personally or by certified mail to the addressee only. . . . Owner would reimburse Company cost of all annual promotions' value with early termination and lost revenues based on historical data" [*Id*. at 9–10].  A subsequent paragraph states "Company will discuss with Owner (upon request) how rental management, future bookings, and active rental contract would be impacted by listing cabin for Sale in subsequent month(s)" [*Id*. at 8].

In their Countercomplaint, defendants allege that "[t]he Laurelwood Agreement was terminated prematurely by DCJM due to its sale and transfer of the property and its buyer's refusal to assume or otherwise honor the Laurelwood Agreement" [Doc. 35 ¶ 35].  Per the above analysis (*see supra* Section III(B)(i)(1)), the latter half of this allegation has been dismissed; however, the Court disagrees with plaintiff that the Laurelwood agreement contains no language whatsoever indicating that the sale of the property and early termination would amount to breach.  Per the above-cited provisions, the agreement expressly stated its operative term, including several different provisions requiring plaintiff to provide written notice of its intent to terminate early.  While it is true that these provisions do not appear to provide "clear, express language identifying a sale as a breach"

---

[4]  As discussed before (*see supra* Section I), this term was extended through December 31, 2027, based upon a "limited-time promotion" that plaintiff elected.

[Doc. 40, p. 6], the Court does not find that, construing the Countercomplaint in the light most favorable to defendants, *see Bishop*, 520 F.3d at 519, they "undoubtedly can prove no set of facts in support of those allegations that would entitle them to relief."

Therefore, the Court will permit defendants' allegation of breach on grounds of early termination.

### 3. Sufficiency of Pleading Breach of the Covenant of Good Faith

Turning next to plaintiff's argument that defendants have failed to sufficiently plead facts in support of their allegation that plaintiff breached the covenant of good faith and fair dealing [*See* Doc. 35 ¶ 37], it appears that the foregoing analysis will preserve this allegation, as well. The parties appear to agree that this claim rises and falls with the validity of defendants' breach of contract claim because the implied obligation of good faith and fair dealing derives from an independent breach of contract claim [*See* Doc. 40, p. 8; Doc. 42, p. 6]. *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) ("Tennessee courts have consistently applied the principle that Tennessee law recognizes an implied covenant of good faith and fair dealing in every contract.").

Therefore, the Court rejects plaintiff's arguments as to the implied covenant of good faith and fair dealing.

### 4. Construing the Agreement as a Transfer Fee Covenant

With respect to the specific damages sought by defendants, plaintiff argues that "lost rental commissions, lost fee revenue, and the value of marketing signage display" constitute transfer fees that are expressly prohibited under Tennessee public policy [Doc.

15

40, p. 9 (citing Tenn. Code Ann. § 66-37-103)]. "Transfer fee" is statutorily defined as "a fee or charge imposed by a transfer fee covenant," which is further defined as:

> [A] provision in a document, whether recorded or not and however denominated, that purports to run with the land or bind current owners or successors in title to specified real property located in this state, and that obligates a transferee or transferor of all or part of the property to pay a fee or charge to a third person upon transfer of an interest in all or part of the property, or in consideration for permitting any such transfer.

Tenn. Code Ann. §§ 66-37-102(3), (4). Based on the plain meaning of the statute, the Court finds that the damages sought related to plaintiff's alleged breach of contract fall outside the scope of § 66-37-102. For example, unlike the transfer fee contemplated by the statute, which is triggered "upon transfer of an interest in all or part of the property," Tenn. Code Ann. 66-37-102(4), the remaining breach of contract theory pertains to early termination—not the actual transfer or sale of the Laurelwood property.

Therefore, to summarize, plaintiff's Motion to Dismiss Defendants/Counter-Plaintiffs Counter-Complaint [Doc. 31 (as amended by Doc. 39)] is hereby **GRANTED in part** and **DENIED in part** as to Count I. Count I of defendants' countercomplaint may proceed as to plaintiff's alleged early termination of the Laurelwood agreement, but not as to plaintiff's alleged failure to sell the property to a buyer who would assume or otherwise honor the Laurelwood agreement.

### ii. Dismissal of Count II as to MP

Plaintiff raises four arguments in support of dismissing MP's breach of contract claim, as well [Doc. 40, pp. 10–18]. First, it argues that MP is not an intended third-party beneficiary of the contract between itself and AB; therefore, MP is not a party to the

16

agreement and cannot raise a claim for breach [*Id*. at 10–14]. Second, plaintiff contends that the Laurelwood agreement does not constitute an exclusive right to sell agreement, which is otherwise required under Tennessee law [*Id*. at 14–15]. Third, it argues that the contract omits certain material terms vis-à-vis MP that would be necessary in order for it to be an enforceable agreement [*Id*. at 15–17]. Fourth, it argues that the provisions concerning plaintiff's use of MP's services are contradictory and conflicting, giving rise to ambiguity and entitling plaintiff to the benefit of *contra proferentum* [*Id*. at 17–18].

Defendants first respond by emphasizing the applicable standard of review at dismissal rather than summary judgment: they need to sufficiently allege, but not prove, MP's third-party beneficiary status [Doc. 42, pp. 6–7]. They counter plaintiff's characterization of the contract as "an agreement to agree" with respect to MP because the contract contained a "market best" commission term, which was further confirmed by the parties' conduct after execution [*Id*. at 8–9]. As to the ambiguity argument, defendants point out that such a determination is not appropriate at the motion to dismiss stage because contractual interpretation is a question of fact [*Id*. at 9].

While Tennessee courts recognize incidental third-party beneficiaries, only an intended beneficiary may bring suit to enforce a contract. *First Tennessee Bank Nat. Ass'n v. Thoroughbred Motor Cars, Inc*., 932 S.W.2d 928, 930 (Tenn. Ct. App. 1996). To establish that a party was an intended third-party beneficiary, the Tennessee Supreme Court has held that a party must show "(1) the parties to the contract have not otherwise agreed, (2) recognition of the third-party's right to performance is appropriate to effectuate the

17

parties' intent, and (3) terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promisee to the third party." *Benton v. Vanderbilt Univ.*, 137 S.W.3d 614, 618 (Tenn. 2004) (*citing Owner-Operator Independent Drivers Association v. Concord EFS, Inc*., 59 S.W.3d 63, 70 (Tenn. 2001)).  As the *First Tennessee* court explained somewhat differently, "[i]ntent to benefit may be shown if 'there is either an expression in the contract that the contracting parties intended to benefit the third party (the "intent to benefit" test) or proof that the promisor's performance would otherwise discharge a duty owed to a third party beneficiary by the promisee (the "duty owed" test).'" *First Tennessee*, 932 S.W.2d at 930 (quoting *Moore Construction Co. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1, 9 (Tenn. Ct. App. 1985)).

Defendant MP does not appear to be an intended third-party beneficiary of the Laurelwood agreement under the applicable tests provided under Tennessee law.  As an initial matter, MP was not a party to the Laurelwood Agreement [*See* Doc. 33-1, pp. 8–10]. The agreement variously refers to "[c]ompany's in-house licensed real estate company," "on-site real estate company," and "on-site real estate office," but never mentions MP by its legal name [*Id*].  Defendants allege that plaintiff was aware that MP the above-referenced real estate business at all relevant times but appear to acknowledge that this connection is not expressly reflected in the Laurelwood agreement [Doc. 35 ¶¶ 46–47]. The imprecision of these references notwithstanding, no provision imposes a mandatory right or obligation with respect to MP; rather, the provisions provide that plaintiff may elect to use MP's services if it desires to do so [*See, e.g.*, Doc. 33-1, p. 8 (emphasis added)

18

("Owner *may* use Company's in-house licensed real estate company for listing services, *as necessary*."); *id*. at 10 ("On-site real estate company will list property for Sale, *if & when Owner desires . . .*")]. While defendants characterize these provisions as a "listing requirement" being "merely conditioned upon DCJM electing to sell the property during the term of the Laurelwood Agreement in the first place" [Doc. 42, p. 8], the Laurelwood agreement does not require plaintiff to deal with MP whatsoever if it chooses not to do so. Given the voluntary nature of these provisions, it does not appear to the Court that "recognition of [MP's] right to performance," to the extent any such right exists, "is appropriate to effectuate the parties' intent" in entering into the Laurelwood agreement because plaintiff's decision to use or not use MP's services does not appear to bear on the remainder of the contract. *See Benton*, 137 S.W.3d at 618.

Additionally, based upon this voluntary language, it does not appear that "terms or circumstances indicate that performance of the promise is intended or will satisfy an obligation owed by the promisee to [MP]." *See id*. Turning again to the Laurelwood agreement's first indirect reference to MP, it states that "Owner *may* use Company's in-house licensed real estate company for listing services, *as necessary*" [Doc. 33-1, p. 8 (emphasis added)]. It is unclear how this clause could give rise to any obligation owed by plaintiff to MP because, again, it merely provides that plaintiff may elect to use MP's services. Even assuming *arguendo* that this clause, taken in conjunction with the agreement's other allusions to MP, creates an obligation between plaintiff and MP,

19

defendants have not pleaded "terms or circumstances indicat[ing] that performance" of the agreement would satisfy an alleged obligation owed to MP [*See* Doc. 35 ¶¶ 43–59].

Bearing in mind the applicable standard of review, the Court "must construe the [Counterclaim] in a light most favorable to [defendants]," *Bishop*, 520 F.3d at 519; but the Court need not accept legal conclusions as true. *Montgomery*, 346 F.3d at 698. Even construing Count II in the most favorable light to defendants, the Court does not accept their conclusion that MP was an intended third-party beneficiary of the Laurelwood agreement based upon the foregoing analysis of the contract and applicable Tennessee law. Because the Court has determined that MP lacks sufficient status to bring a breach of contract claim as to the Laurelwood agreement, the Court need not address the parties' remaining arguments regarding right to sell requirements, material terms, and *contra proferentum*. *See ChampionX, LLC v. Resonance Sys., Inc.*, 726 F. Supp. 3d 786, 826 (E.D. Tenn. 2024) (Varlan, J.) (granting in part a motion to dismiss on grounds that an alleged third-party beneficiary lacked capacity to sue for breach of contract).

Therefore, the plaintiff's Motion to Dismiss Defendants/Counter-Plaintiffs Counter-Complaint [Doc. 31 (as amended by Doc. 39)] is hereby **GRANTED** as to Count II. Count II of defendants' counterclaim is **DISMISSED** in its entirety.

### iii. Motion for a More Definite Statement

In the alternative, plaintiff moves for a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) [Doc. 40, p. 18]. Drawing upon its earlier argument regarding omitted terms, plaintiff argues that defendants have failed to reference the

contract between itself, and MP and a more precise pleading is required in order for it to respond appropriately [*Id*. at 19]. Defendants respond in opposition, citing the liberal pleading standard provided by Federal Rule of Civil Procedure 8 [Doc. 42, p. 9].

Based upon the Court's foregoing analysis and dismissal of Count II, it appears to the Court that plaintiff's grounds for this alternative motion are mooted [*See* Doc. 40, p. 19 ("Should the Court not grant the motion to dismiss, Plaintiff respectfully requests that the Court require Defendants to proffer a more definite statement.")]. Accordingly, plaintiff's Motion to Dismiss Defendants/Counter-Plaintiffs Counter-Complaint [Doc. 31 (as amended by Doc. 39)] is hereby **DENIED as moot** insofar as it requests a more definite statement.

## IV. Conclusion

For the reasons explained above, defendants' Partial Motion to Dismiss [Doc. 26] is **DENIED as moot** and plaintiff's Motion to Dismiss Defendants/Counter-Plaintiffs Counter-Complaint [Doc. 31 (as amended by Doc. 39)] is **GRANTED in part** and **DENIED in part**. Specifically, Count I of defendants' countercomplaint may proceed as to plaintiff's alleged early termination of the Laurelwood agreement, but is otherwise **DISMISSED**. Count II is **DISMISSED** in its entirety. Plaintiff's request for a more definite statement is **DENIED as moot**.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE